IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TRESA DURDEN, f/k/a Tresa McCowell, and MICHAEL LANE DURDEN, | |
| **Plaintiffs,** | |
| v. | 1:15-cv-3971-WSD |
| STATE FARM FIRE AND CASUALTY COMPANY, | |
| **Defendant.** | |

## OPINION AND ORDER

This matter is before the Court on Defendant State Farm Fire and Casualty Company's ("Defendant") Motion for Summary Judgment [24].

## I.   BACKGROUND

### A.   Insurance Policy

In July 2014, Defendant issued a renters insurance policy ("Policy") to Plaintiffs Tresa Durden ("Mrs. Durden") and Michael Lane Durden ("Mr. Durden") (together, "Plaintiffs"). ([24.4] at 2). The Policy provides coverage, from July 15, 2014, to July 15, 2015, for "accidental direct physical loss" to Plaintiffs' personal property. ([24.4] at 2, 22). Plaintiffs are not entitled to payment under the Policy if they "cause[] or procure[] a loss to property . . . for the

purpose of obtaining insurance benefits" or if they "intentionally conceal[] or

misrepresent[] any material fact or circumstance relating to th[e] insurance,

whether before or after a loss."  (Plaintiffs' Response to Defendant State Farm Fire

and Casualty Company's Statement of Undisputed Material Facts [31.2]

("Pl. Resp. DSMF") ¶¶ 57-58).  The Policy requires Plaintiffs to take certain steps

after suffering a covered loss:

> After a loss to which this insurance may apply, you shall see that the following duties are performed:
>
> a.  give immediate notice to us or our agent.  Also notify the police if the loss is caused by theft.  Also notify the credit card company or bank if the loss involves a credit card or bank fund transfer card;
>
> b.  protect the property from further damage or loss, make reasonable and necessary temporary repairs required to protect the property, keep an accurate record of repair expenditures;
>
> c.  prepare an inventory of damaged or stolen personal property. Show in detail the quantity description, age, replacement cost and amount of loss.  Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;
>
> d.  as often as we reasonably require:
>
> > (1)  exhibit the damaged property;
> >
> > (2)  provide us with records and documents we request and permit us to make copies;
> >
> > (3)  submit to and subscribe, while not in the presence of any other insured:

(a)  statements; and

(b)  examinations under oath;

. . . .

(Pl. Resp. DSMF ¶ 28).

The Policy limits the circumstances in which Plaintiffs may file suit against Defendant:  "No action shall be brought unless there has been compliance with the policy provisions.  The action must be started within one year after the date of loss or damage."  (Pl. Resp. DSMF ¶ 55).

B.    Plaintiffs' Claims under the Policy

On September 10, 2014, Plaintiffs were evicted from their home for withholding lease payments from their landlord.  (Pl. Resp. DSMF ¶¶ 1-3, 8).[1] Deputies from the Sheriff's Office of Butts County were present when the eviction occurred.  (Pl. Resp. DSMF ¶ 3).  The eviction was conducted pursuant to a writ of possession issued by the Magistrate Court of Butts County.  (Pl. Resp. DSMF ¶ 3).

On September 19, 2014, Mrs. Durden told the Sheriff's Office that approximately $10,109 of Plaintiffs' personal property was stolen during the eviction.  ([24.7] at 6; Pl. Resp. DSMF ¶ 17).  She said that she hired two strangers

---

[1]    Plaintiffs claim they withheld the payments because the landlord refused to make certain repairs to their home.  (Pl. Resp. DSMF ¶ 8).

to help move her belongings from her home, that they took two loads of Plaintiffs' property in a truck and trailer, and that they "took the property some where [sic] other than the storage location" to which they were instructed to deliver the property.  ([24.7] at 6; Pl. Resp. DSMF ¶ 16).  On September 26, 2014, Plaintiffs filed a claim under the Policy.  (Pl. Resp. DSMF ¶ 6).  On October 16, 2014, Mrs. Durden supplemented her police report, stating that $19,311 of Plaintiffs' personal property was stolen.  (Pl. Resp. DSMF ¶ 18).

On December 5, 2014, Mrs. Durden provided Defendant with her recorded statement.  (Pl. Resp. DSMF ¶ 7).  She said that Plaintiffs' personal property was stolen or damaged during the eviction.  (Pl. Resp. DSMF ¶ 8).  She claimed $30,000 in missing property.  (Pl. Resp. DSMF ¶ 8).  She said the Sheriff's Office did not believe she lost as much property as she claimed.  (Pl. Resp. DSMF ¶ 8).  She said the Sheriff's Office interviewed the individuals involved in the eviction, and could not corroborate Plaintiffs' story.  (Pl. Resp. DSMF ¶ 8).

In December 2014, Defendant asked Plaintiffs to provide the following documents in support of their claim:  the police report, eviction documents, an inventory of the stolen or damaged property, and proof of Plaintiffs' ownership of the property.  (Pl. Resp. DSMF ¶ 9).  On January 12, 2015, Plaintiffs provided Defendant with an inventory of hundreds of items, totaling $41,223 in stolen

4

property and $32,312.99 in damaged property.  (Pl. Resp. DSMF ¶¶ 11-12).

The list of stolen items included thousands of dollars of jewelry, twenty lighters

valued at $30 each, and several holiday decorations.  (Pl. Resp. DSMF ¶ 12).  The

list of damaged items included frozen food and food from Plaintiffs' pantry.

(Pl. Resp. DSMF ¶ 12).  The inventory also included baby items such as a

Fisher Price electric swing, a Graco travel system car seat and stroller, and a

Graco bouncy seat.  (Pl. Resp. DSMF ¶ 13).  Plaintiffs' youngest child was

seventeen years old at the time of the eviction.  (Pl. Resp. DSMF ¶ 13).

On January 26, 2015, Plaintiffs provided Defendant with a copy of the

Sheriff's Office Incident Report.  (Pl. Resp. DSMF ¶¶ 15-18).  Plaintiffs also

provided Defendant with other documents, including photographs, receipts, and

product manuals.  (Pl. Resp. DSMF ¶ 10).  In light of the information submitted by

Plaintiffs, Defendant determined that Plaintiffs' reported losses were

"questionable," that they included "numerous family heirlooms," that they

included the "total contents of business/home including items of little or no value,"

and that Plaintiffs' inventory of items "differ[ed] significantly from the police

department's crime report."  (Pl. Resp. DSMF ¶ 19).

On January 30, 2015, Defendant received a telephone call from Lt. Darrel

Powers of the Butty County Sheriff's Office.  (Pl. Resp. DSMF ¶ 20).  Lt. Powers

told Defendant (1) that Mrs. Durden "goes by several different names," (2) that he has a video showing that Plaintiffs' property was appropriately removed from their home, (3) that Mrs. Durden has "a history of being evicted and making claims of theft," (4) that Mrs. Durden repeatedly returned to the Sheriff's Office to add items to the list of allegedly stolen property, (5) that he told Mrs. Durden she was no longer permitted to add items to the list, and (6) that the Sheriff's Office "don't believe her and they are closing the case and are not going to deal with her any longer." (Pl. Resp. DSMF ¶ 20).

On February 2, 2015, Plaintiffs provided Defendant with an amended inventory, listing $34,553.86 in stolen property, with a replacement cost of $59,608.23. (Pl. Resp. DSMF ¶ 21). On February 17, 2015, Plaintiffs' landlord told Defendant that he had a judgment against Plaintiffs for thousands of dollars, that Mrs. Durden was previously evicted from a house in Jasper County, and that Mrs. Durden claimed, on four prior occasions, in different counties, that items were stolen from her during evictions. (Pl. Resp. DSMF ¶ 22).[2] On February 24, 2015, Lt. Darrel Powers told Defendant that "the theft was completely fabricated," that "the eviction was videotaped and done legally," that Mrs. Durden was a "liar," that she was previously evicted from Jasper County, and

---

[2]     Plaintiffs state they have never been evicted. (Pl. Resp. DSMF ¶ 22).

that she had used a variety of aliases to commit the same "scam" in other counties. (Pl. Resp. DSMF ¶ 24).

On March 2, 2015, Defendant sent Mrs. Durden a copy of the Policy provision that lists her "duties after loss," including her duty to "provide [Defendant] with records and documents [that Defendant] request," and her duty to provide any requested statements and to submit to examinations under oath. ([24.9]; (Pl. Resp. DSMF ¶ 26).  Defendant asked Mrs. Durden to comply with this provision and to complete, by May 2, 2015, a Sworn Statement in Proof of Loss. (Pl. Resp. DSMF ¶ 26).

On March 27, 2015, Defendant asked Mrs. Durden to submit, on April 3, 2015, in Atlanta, to an examination under oath ("EUO").  (Pl. Resp. DSMF ¶ 27).  Defendant sought to resolve several coverage issues, including whether Plaintiffs intentionally caused their losses or misrepresented any material facts regarding their claim.  (Pl. Resp. DSMF ¶ 25).[3]  Defendant asked

---

[3]  Defendant also sought to determine whether Plaintiffs' losses constituted "accidental direct physical loss," whether Plaintiffs took all required steps after suffering their loss, whether Plaintiffs abandoned their property, and whether Plaintiffs "use[d] all reasonable means to save and preserve the property at and after the time of [their] loss."  ([24.4] at 22; Pl. Resp. DSMF ¶¶ 25, 59-60).  These questions were relevant to Plaintiffs' entitlement to payment under the Policy.

Mrs. Durden to provide several documents in advance of the EUO, including the following:

- A completed Sworn Proof of Loss;

- Copies of all Leases where she had resided (2010 to present);

- Receipts, invoices, credit card records, owner's manuals, photographs, and other items substantiating the claimed amounts;

- Income Records – tax returns, records reflecting household income (2013 and 2014), all working financial records (2013 and 2014), and monthly bank statements (2013 and 2014);

- Debt/Expense Records – records reflecting household expenses (2013 and 2014), copies of leases, copies of any bankruptcy petitions, copies of any credit and debit card statements for all cards (2013 and 2014);

- Documents reflecting items pawned by Plaintiff Tresa Durden, her children, or spouse (2012, 2013, 2014);

- The name and address of any moving van or truck, moving service, storage facility, the name of the renter, and a copy of the contract (2012, 2013, 2014);

- A printout of social media accounts for all social media accounts (for the time period of January 1, 2014 through October 31, 2014).

(Pl. Resp. DSMF ¶ 29; [24.10] at 3-4). Defendant advised Mrs. Durden that it "insists upon strict compliance with the policy conditions" and that "[n]o further action will be taken on [her] claim until the examination has been completed and signed and until all documents requested have been produced." ([24.10] at 5).

8

Defendant told Mrs. Durden she was not required to produce any documents that she did not have or could not obtain.  ([24.10] at 4).

On March 31, 2015, Mrs. Durden asked Defendant to move her EUO to Stockbridge, Georgia.  (Pl. Resp. DSMF ¶ 30; [24.11]; [24.13]).  Defendant agreed to do so.  (Pl. Resp. DSMF ¶ 30; [24.11]).  On April 2, 2015, Mrs. Durden cancelled the EUO and informed Defendant that she had retained counsel. ([24.12]; Pl. Resp. DSMF ¶ 31).  On April 21, 2015, Defendant rescheduled the EUO for May 1, 2015.  ([24.13] at 1; Pl. Resp. DSMF ¶ 32).  Defendant also reiterated its earlier request that Mrs. Durden submit certain documents to Defendant in advance of the EUO.  (Pl. Resp. DSMF ¶ 32).

On April 29, 2015, Mrs. Durden cancelled the EUO for a second time.  (Pl. Resp. DSMF ¶ 33).  On May 1, 2015, Defendant warned Mrs. Durden that further delay could jeopardize her coverage under the Policy.  (Pl. Resp. DSMF ¶ 33). Defendant also reiterated that it requires "strict compliance with all policy conditions." ([24.14]).  On May 7, 2015, Mrs. Durden called Defendant and complained about its requests for documentation and an EUO.  (Pl. Resp. DSMF ¶ 34).  Mrs. Durden said she thought Defendant's requests were too personal and that Defendant did not have a right to conduct an EUO.  (Pl. Resp. DSMF ¶ 34). On May 12, 2015, Mrs. Durden informed Defendant that she or her attorney would

contact Defendant to reschedule the EUO.  (Pl. Resp. DSMF ¶ 35).  Two days later, Defendant again advised Mrs. Durden that her claim could not be processed until she provided the requested documents and underwent an EUO.  ([24.15]).  Defendant stated that further delay could jeopardize her coverage under the Policy and that Defendant "insists upon strict compliance with all policy conditions."  ([24.15]).  Defendant also warned Mrs. Durden that, under the Policy, she could not bring an action against Defendant unless she complied with all Policy provisions within one year of the date of her loss.  ([24.15]).

Almost three months later, on August 3, 2015, Mrs. Durden contacted Defendant and rescheduled her EUO for August 14, 2015.  (Pl. Resp. DSMF ¶ 36).  On August 4, 2015, Defendant sent Mrs. Durden a letter, reiterating Defendant's earlier request for documents in advance of the EUO, stating that "strict compliance with the policy conditions" was required, and warning that "[n]o further action will be taken on [Plaintiffs'] claim until the examination has been completed and signed and until all documents requested have been produced."  ([24.16]).  Defendant's letter also included a copy of the Policy provision that lists Plaintiffs' duties after suffering a loss, including Plaintiffs' duty to provide Defendant with requested documents and to submit to an EUO.  ([24.16]).

On August 14, 2015, Defendant took Mrs. Durden's EUO. (Pl. Resp. DSMF ¶ 37). Mrs. Durden brought an amended inventory to the EUO, claiming $35,325.44 in stolen property, with a replacement cost of $60,119.81. (Pl. Resp. DSMF ¶ 43). She also brought a copy of her Sworn Statement in Proof of Loss, claiming $59,608.23 in stolen property and $32,312.99 in damaged property. (Pl. Resp. DSMF ¶ 42). She did not bring, or otherwise submit, other documents requested by Defendant. ([24.19] at 1). She told Defendant it was "not legally entitled to the following documents and records nor are these records relevant to [Plaintiffs'] claim: Bank statements and records, tax returns, credit card statements, leases, Facebook, Twitter, Instagram, or LinkedIn, bankruptcy records, phone records, moving truck, moving van, moving service, and storage facility." (Pl. Resp. DSMF ¶ 39).

Mrs. Durden also refused, at her EUO, to answer questions concerning (1) her household income and finances,[4] (2) her cell phone,[5] (3) her prior leases, (4) her current landlord, (5) where she lived previously, (6) prior lawsuits in which

---

[4]    Mrs. Durden refused to answer whether she received monthly income from other than her husband's job. (Pl. Resp. DSMF ¶ 40; [24.13] at 13). She stated that she had a retirement account, "some savings," and that "her children received [almost $100,000] as a result of their father being a disabled Veteran who is deceased." (Pl. Resp. DSMF ¶ 40; [31.8] at 1; [24.23] at 13).

[5]    Mrs. Durden used her cell phone during the eviction, but refused to provide the name of the carrier. (Pl. Resp. DSMF ¶ 41).

she was involved, (7) whether she previously filed for bankruptcy, (8) whether she pawned any items in the last three years, (9) whether she was evicted previously, and (10) the U-haul she rented on the date of her loss.  (Pl. Resp. DSMF ¶ 38).  In view of Mrs. Durden's failure to answer these questions, and her failure provide the required documentation, Defendant could not complete the EUO.  (Pl. Resp. DSMF ¶ 44).

On August 24, 2015, Defendant told Mrs. Durden it could not "render a decision on [her] claim until all of the records and documents requested have been produced." ([24.19] at 4).  Defendant provided Mrs. Durden with a copy of the Policy provision listing Plaintiffs' duties after suffering a loss, and reiterated that Defendant "demand[s] strict compliance with all provisions in the insurance contract." ([24.19] at 4).

Plaintiffs did not, before filing this action, produce the "requested credit or debit card records, bank records, tax returns, household income or expense records, debt/expense records, moving or storage records, or social media records." (Pl. Resp. DSMF ¶ 50).  Mrs. Durden had access to these documents but declined to produce them because she believed they were irrelevant.  (Pl. Resp. DSMF ¶ 50).

12

C.    Procedural History

On September 9, 2015, Plaintiffs filed their Complaint [1.1] in the Superior Court of Henry County, asserting a claim for breach of contract.  Plaintiffs argue that, in violation of the Policy, Defendant failed to "fully indemnify the Durdens for the value of their loss to their personal property due to the September 10, 2014 theft and vandalism occurrence."  (Compl. ¶ 9).  Plaintiffs seek damages of $60,000 or $90,000.  (Compl. at 8).

On November 13, 2015, Defendant removed this action from state court. ([1]).  On June 30, 2016, Defendant filed its Motion for Summary Judgment. Defendant argues that Plaintiffs' claims are barred because Plaintiffs were required, but failed, to comply with the Policy's provisions before filing their Complaint.  ([24.1] at 24).  Specifically, Defendant claims that Plaintiffs failed to produce documents or adequately submit to an examination under oath, in violation of the Policy.  ([24.1] at 24-25).

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Ahmed v. Air France-KLM, 165 F. Supp. 3d 1302, 1309 (N.D. Ga.

2016); see Fed. R. Civ. P. 56. "An issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" W. Grp. Nurseries, Inc. v. Ergas, 167 F.3d 1354, 1360 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. at 1361 (quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [materials] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The movant[] can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1281-82 (11th Cir. 1999). The moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." Celotex, 477 U.S. at 323. Once the moving party has met its initial burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham, 193 F.3d at 1282. The nonmoving party "need

14

not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48.

"If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." Apcoa, Inc. v. Fid. Nat. Bank, 906 F.2d 610, 611 (11th Cir. 1990) (internal quotation marks omitted) (quoting Anderson, 477 U.S. at 250).  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)); cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (a party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict" (quoting

Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (internal quotation marks omitted))).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott, 550 U.S. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury." Graham, 193 F.3d at 1282. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." Id.

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 322-23; see Freeman v. JPMorgan Chase Bank N.A.,

-- Fed. App'x --, 2017 WL 128002, at *4 (11th Cir. Jan. 13, 2017) (same);

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1247 (11th Cir. 1999) ("If the

non-movant in a summary judgment action fails to adduce evidence which would

be sufficient, when viewed in a light most favorable to the non-movant, to support

a jury finding for the non-movant, summary judgment may be granted.").

## III.   DISCUSSION

### A.   Insurance Contracts under Georgia Law[6]

"Insurance in Georgia is a matter of contract and the parties to the contract

of insurance are bound by its plain and unambiguous terms."  Hurst v. Grange Mut.

Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996); see Yeomans & Assoc. Agency,

Inc. v. Bowen Tree Surgeons, Inc., 618 S.E.2d 673, 677 (Ga. Ct. App. 2005)

("[A]n insurance policy is simply a contract, the provisions of which should be

construed as any other type of contract.").

"Where the terms and conditions of an insurance contract are clear and

unambiguous, they must be given their literal meaning."  Adams v. Atlanta Cas.

Co., 509 S.E.2d 66, 68 (Ga. App. Ct. 1998); see Donaldson v. Pilot Life Ins. Co.,

341 S.E.2d 279, 280 (Ga. Ct. App. 1986) ("Where the language fixing the extent of

coverage is unambiguous, . . . and but one reasonable construction is possible, this

court must enforce the contract as written.").  If the terms of the policy are

ambiguous, "the statutory rules of contract construction will be applied,"

---

[6]      "In diversity cases, the Court is bound by the applicable state law governing
the contract, in this case Georgia law."  Giddens v. Equitable Life Assur. Soc. of
U.S., 445 F.3d 1286, 1297 (11th Cir. 2006).

Pomerance v. Berkshire Life Ins. Co. of Am., 654 S.E.2d 638, 640 (Ga. Ct. App. 2007), and the ambiguities will "be strictly construed against the insurer as the drafter of the document," Federated Mut. Ins. Co. v. Ownbey Enterprises, Inc., 627 S.E.2d 917, 921 (Ga. App. Ct. 2006); see Giddens, 445 F.3d at 1297 ("[W]hen a policy is ambiguous, or is capable of two reasonable interpretations, it is construed in the light most favorable to the insured and against the insurer."). "[A] word or a phrase is ambiguous when it is of uncertain meaning and may be fairly understood in more ways than one." Ownbey Enterprises, 627 S.E.2d at 921 (citation and internal quotation marks omitted).

"[W]here an insurance contract contains unambiguous terms excluding coverage," however, "no construction is required, and the plain meaning of the terms must be given full effect without straining to extend coverage where none was contracted or intended." State Farm Fire & Cas. Co. v. Bauman, 723 S.E.2d 1, 3 (Ga. Ct. App. 2012). "[A]n insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law." Henning v. Cont'l Cas. Co., 254 F.3d 1291, 1295 (11th Cir. 2001) (internal quotation marks omitted) (quoting Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc., 466 S.E.2d 4, 6 (Ga. 1996)). "Policyholders have a duty to read the insurance contract,

18

and they are charged with knowledge of its contents." Bogard v. Inter-State Assur. Co., 589 S.E.2d 317, 318-19 (Ga. Ct. App. 2003).

"[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide." Giddens, 445 F.3d at 1297 (citing O.C.G.A. § 13-2-1); see Pomerance, 654 S.E.2d at 640 ("The proper construction of a contract is a question of law for a court to decide.").

B.      Plaintiffs' Claims for Breach of Contract

The Policy requires Plaintiffs to submit to examinations under oath and to "provide [Defendant] with records and documents [that Defendant] request." (Pl. Resp. DSMF ¶ 28). "Fulfillment of this requirement was a condition precedent to bringing suit," Allstate Ins. Co. v. Hamler, 545 S.E.2d 12, 13 (Ga. Ct. App. 2001), because the Policy bars Plaintiffs from bringing an action "unless there has been compliance with the policy provisions," (Pl. Resp. DSMF ¶ 55). "Conditions precedent such as this are binding against the insured." Farmer v. Allstate Ins. Co., 396 F. Supp. 2d 1379, 1382 (N.D. Ga. 2005); see Shan Hsu v. Safeco Ins. Co. of Indiana, 654 F. App'x 979, 980 (11th Cir. 2016) ("Under Georgia law, an insurer may require its insured to abide by the terms of his policy and cooperate with the insurer's investigation as a precondition to recovery.").

19

"If the [Plaintiffs] failed to provide *any* material information called for under [the Policy], they breached the insurance contract" and are barred from bringing suit against Defendant. Halcome v. Cincinnati Ins. Co., 334 S.E.2d 155, 157 (Ga. 1985). "Georgia courts take a broad view of materiality." Lucas v. State Farm Fire & Cas. Co., 864 F. Supp. 2d 1346, 1354 (M.D. Ga. 2012). "[M]ateriality can be properly decided as a matter of law by the court on summary judgment if reasonable minds could not differ on the question." S. Realty Mgmt., Inc. v. Aspen Specialty Inc. Co., No. 08-cv-0572, 2009 WL 1174661, at *4 (N.D. Ga. Apr. 28, 2009). "Where an insurer suspects that a claim might be fraudulent, information relating to the insured's recent income and sources of income is material and relevant to the suspicion of fraud and to the insured's possible financial motive." Farmer, 396 F. Supp. 2d at 1382.

The insurance policy in Halcome, like the Policy here, required plaintiffs to submit to examinations under oath and to produce documents requested by the insurance company. The Halcome plaintiffs filed claims under the policy after their car allegedly was stolen from a motel parking lot. They claimed a property loss of approximately $130,000, the bulk of which was for jewelry contained in the stolen car. The insurance company became

suspicious of the claim after discovering that (1) plaintiffs previously filed an insurance claim for a burglary loss of about $136,000, the majority of which was for jewelry; (2) plaintiffs recently increased the coverage on their jewelry, (3) plaintiffs recently filed, but did not prevail in, a lawsuit against other companies, (4) plaintiffs were sued, three years earlier, for delinquent rental payments, and (5) plaintiffs were unemployed at the time of the alleged theft.

The plaintiffs submitted to an examination under oath, where they answered several questions and produced several documents.  Plaintiffs refused, however, to provide certain financial records requested by the insurance company, including documents showing plaintiffs' income and sources of income for several years preceding their claim.  Plaintiffs argued "the information sought [was] not relevant to the claim under investigation, and [was] of a private nature so that its disclosure should not be required." 334 S.E.2d at 157.  The Georgia Supreme Court found that plaintiffs' "recent income and sources of income" were material—that is, "relevant"— because "there [was] evidence of possible fraud." Id.  The court held that plaintiffs were barred from recovery because they breached their insurance contract by failing to produce the required information.  Id.

The insurance policy in <u>Hamler</u> also required plaintiff to produce documents requested by the insurance company.  The policy precluded plaintiff from bringing suit unless she complied with "all policy terms." 545 S.E.2d at 13.  Plaintiff filed a claim under the policy after several items allegedly were stolen from her home.  Plaintiff submitted to an examination under oath and produced several documents requested by the insurance company, including bank statements, receipts, her driver's license, photographs of the stolen items, and copies of the police reports.  Plaintiff refused, however, to produce her tax returns, documents reflecting her income, telephone or other utility bills, credit card or other loan statements, and records showing her hospital admissions and discharges.

The Georgia Court of Appeals held that plaintiff "breached the contract of insurance by failing to provide these documents, even though [plaintiff] did provide certain other information." <u>Id.</u> at 14.  The court found that the insurance company "was authorized to suspect fraudulent behavior" because plaintiff's statements during her examination under oath "differed in certain respects from her earlier statements." <u>Id.</u>  The court concluded that "the information sought by [the insurance company] was relevant to its suspicion of fraud and to a possible financial motive." <u>Id.</u>  Plaintiff was

22

barred from bringing an action against the insurance company because she failed to produce the requested documents.

As in <u>Halcome</u> and <u>Hamler</u>, "there is evidence of possible fraud" in this case.  <u>Halcome</u>, 334 S.E.2d at 157.  Between her eviction and her examination under oath, Plaintiffs' alleged losses increased from approximately $10,000 to $60,000 in stolen property.[7]  Her initial claim of $10,000 doubled within a month of her first police report.  (<u>See</u> Pl. Resp. DSMF ¶¶ 17-18).  The Sheriff's Office repeatedly informed Defendant that they did not believe Mrs. Durden's story, that she repeatedly added items to her list of allegedly stolen property, that she was a "liar," that they closed her case after failing to corroborate her version of events, that she had "a history of being evicted and making claims of theft," that she used a variety of aliases to commit the same "scam" in other counties, and that they had a video showing Plaintiffs' property was appropriately moved during the eviction.  (Pl. Resp. DSMF ¶¶ 8, 20, 24).  Plaintiffs' landlord also told Defendant he had a judgment against Plaintiffs for thousands of dollars, and that Mrs. Durden claimed, on four prior occasions, in different counties, that

---

[7] Plaintiffs' final inventory claimed approximately $35,000 in stolen property, with a replacement cost of approximately $60,000.  Plaintiffs' Sworn Statement in Proof of Loss claims $59,608.23 in stolen property.

items were stolen from her home during evictions.  (Pl. Resp. DSMF ¶ 22).
This information, regardless of its ultimate truthfulness, "authorized
[Defendant] to suspect fraudulent behavior" from Plaintiffs.  Hamler, 545
S.E.2d at 14.

      It is undisputed that Plaintiffs did not, before filing this action, produce
several documents requested by Defendant, including "credit or debit card records,
bank records, tax returns, household income or expense records, debt/expense
records, moving or storage records, or social media records."  (Pl. Resp. DSMF
¶ 50).  These documents are similar—and, in some instances, identical—to those in
Hamler and, as in that case, they are relevant to Defendant's "suspicion of fraud
and to a possible financial motive."  Hamler, 545 S.E.2d at 14; see JC & C
Inc. v. Peerless Indem. Ins. Co., No. 1:11-cv-3591, 2013 WL 1346021, at *3 (N.D.
Ga. Apr. 3, 2013), aff'd, 548 F. App'x 604 (11th Cir. 2013) ("In a case where there
is possible fraud, such as this one, information about the insured's income and
financial situation is material and relevant to possible fraud and to the insured's
possible financial motive."); Roberts v. State Farm Fire & Cas. Co., No. 7:11-cv-
86, 2011 WL 6215700, at *6 (M.D. Ga. Dec. 14, 2011), aff'd, 479 F. App'x 223
(11th Cir. 2012) ("In a case like this where there is possible fraud, information

about the insured's income and sources of income is material and relevant to possible fraud and to the insured's possible financial motive.").

The Policy bars Plaintiffs from bringing an action "unless there has been compliance with the policy provisions." (Pl. Resp. DSMF ¶ 55). Plaintiffs breached the terms of the Policy by failing to provide "material information" requested by Defendant. <u>Halcome</u>, 334 S.E.2d at 157. Because Plaintiffs failed to comply with a condition precedent for bringing this action, their claims are barred and Defendant is entitled to summary judgment. <u>Cf.</u> <u>Hamler</u>, 545 S.E.2d at 14 ("Hamler refused to comply with Allstate's request for this relevant information and breached her insurance contract. Summary judgment in Allstate's favor consequently was warranted.").

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [24] is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**SO ORDERED** this 27th day of February, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE